Filed 10/14/21  In re Sirypangno CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re KONESAVANH DONALD SIRYPANGNO on Habeas Corpus. | D078705<br><br>(Super. Ct. No. SCD191585) |

ORIGINAL PROCEEDINGS in habeas corpus.
Peter C. Deddeh, Judge.  Relief granted.

George L. Schraer for Petitioner.

Rob Bonta, Attorney General, Julie L. Garland, Assistant Attorney General, Daniel B. Rogers and Jennifer A. Jadovitz, Deputy Attorneys General, for Respondent.


I.

INTRODUCTION

In 2008, a jury found Konesavanh Donald Sirypangno guilty of first degree murder, attempted murder, and assault with a firearm as an aider and abettor to his codefendant, David Phommachanh, who personally shot the two victims.  With respect to the attempted murder charge, the court instructed the jury with a kill zone instruction.  Years later, the California

Supreme Court decided *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), which clarified and restricted the scope of the kill zone theory's applicability.

Based on the authority of *Canizales*, Sirypangno petitions for a writ of habeas corpus arguing that no kill zone instruction was warranted in his case and that the kill zone instruction that the court gave was erroneous.[1] We asked the People to submit an informal response to Sirypangno's petition. The People concede in their informal response that the instruction, as given, was legally erroneous under *Canizales*, and that the instructional error was prejudicial, thus entitling Sirypangno to the vacatur of his attempted murder conviction. For the reasons explained below, we accept the People's concessions and conclude that the trial court gave a legally insufficient kill zone instruction, the instructional error was prejudicial, and the instructional error entitles Sirypangno to have his conviction for attempted murder vacated.[2]

---

[1] Sirypangno is separately appealing from an order of the trial court denying his petition to have his murder and attempted murder convictions set aside pursuant to Penal Code section 1170.95 in case No. D078188.

[2] Although generally the People have a right to file a return in a habeas corpus proceeding, that right "is subject to waiver." (*People v. Romero* (1994) 8 Cal.4th 728, 740, fn. 7.) A petitioner's custodian may instead stipulate to the allegations in the petition and to a petitioner's requested relief and no order to show cause is required. (*Ibid.*) Because the People agree that Sirypangno is entitled to the vacatur of his conviction for attempted murder on the ground that the kill zone instruction provided at trial was insufficient under *Canizales, supra*, 7 Cal.5th 591, we conclude that we may grant the relief that the People concede is warranted without issuing an order to show cause or granting the habeas petition. (See *Romero, supra*, at p. 740, fn. 7.)

2

FACTUAL AND PROCEDURAL BACKGROUND[3]

A.  *Factual background*

In 2005, Sirypangno and Phommachanh were documented members of the Oriental Killer Boys (OKB) criminal street gang.  Sirypangno's gang moniker was "Reckless"; Phommachanh's moniker was "Felon."  Other OKB members included Devin Giraud and Steven Joyce.

On the evening of June 11, 2005, Phommachanh drove his girlfriend, J.R. and his out-of-town cousin, D.B., to a friend's residence and later to a birthday party.  Sirypangno, together with Joyce and Joyce's girlfriend, M.R., drove to these same locations in a separate vehicle.  OKB member Giraud was also at the birthday party.  During the party, J.R. learned that some of her girlfriends were going to a party in Mira Mesa and decided to accompany them.  The plan was for Phommachanh to first pick up his and J.R.'s daughter at her grandparent's house, take the girl home, and then pick up J.R. at the Mira Mesa party and bring her home.

Before Phommachanh headed to the Mira Mesa party, he received a call on his cell phone.  Phommachanh's cousin heard Phommachanh tell the person on the other end of the call to bring a "strap," which is street jargon for a gun, because there might be "some problems" at the party.

At approximately 11 p.m., Phommachanh, D.B. and Giraud arrived at the Mira Mesa party, which was in the backyard of a house. Sirypangno,

---

[3]    We take the background facts from this court's opinion in Sirypangno's direct appeal from his judgment of conviction, *People v. Sirypangno* (February 5, 2012, D055015).  In addition, in February 2021, this court took judicial notice of the records in case Nos. D055015 and D073602, the appeal and a subsequent state habeas corpus proceedings, which also provide the basis for the background information outlined here.  We also consider the record in related case No. D078188, with which this case is being considered.

Joyce and J.R. arrived in a separate vehicle. Access to the party was limited and the host was charging admission. At first, Phommachanh and the rest of the group were not allowed to enter because there were too many people at the party. Phommachanh told the two men who were manning the gate that there would be trouble if he and his friends were not permitted to go inside. J.R. came up to the men at the gate and told them to let Phommachanh and the others in to avoid problems. Phommachanh, D.B., Giraud and J.R. then walked into the backyard without paying, while Sirypangno and Joyce jumped over the backyard fence.

There were a number of altercations at the party that evening, including at least one before Phommachanh and his group arrived. During that argument, a woman who was an affiliate of OKB threatened a young man, who was an invited guest, saying that she would have him jumped by OKB members if he did not apologize for a perceived offense. This woman greeted Phommachanh and the others when they entered the backyard.

At one point, some of the invited guests, none of whom were gang members, complained that they were uncomfortable because Phommachanh and his group were "mad-dogging" or staring at people at the party. The young man who had been threatened by the OKB affiliate and some of his friends approached Phommachanh and Sirypangno, who were standing next to each other, and told them to calm down or they would have to leave. In response, Sirypangno pulled up his shirt, removed a black semiautomatic gun from his waistband, racked a round and pointed the gun at the young man. Although the man did not hear Sirypangno say "OKB" or "this is OKB" and did not see Phommachanh flash gang signs, others who were present testified that they witnessed Sirypangno and Phommachanh do these things. After the gun was displayed, the young man's friends pushed him into the house,

4

while Sirypangno and Phommachanh jumped over the back fence and onto a sidewalk.

After Sirypangno and Phommachanh jumped the fence, Sirypangno stayed on the sidewalk behind the backyard of the party house, but Phommachanh did not. Sirypangno overheard portions of a conversation between Tylor Thompson[4] and J.W., who were standing near the fence. Thompson and J.W. were talking about a group of girls who had been fighting earlier and wondered where "the bitches" had gone. From the other side of the fence, Sirypangno said: "Who you guys calling a bitch?" According to J.W., he and Thompson replied that they were not talking to Sirypangno, they did not know him and they did not call him a bitch. Sirypangno threw a piece of wood at J.W. and Thompson over the fence. When J.W. and Thompson looked over the fence, Sirypangno pulled up his shirt and displayed the gun in his waistband. K.A., a friend of Thompson's and the victim of the attempted murder count, provided a slightly different version of the fence exchange between Thompson and Sirypangno, but concurred that the exchange was argumentative and ended with Sirypangno throwing a piece of wood.[5]

---

[4] Thompson was eventually killed. He is the victim in the murder count.

[5] K.A. testified that Sirypangno said: "What the fuck did you say?" Thompson replied: "I don't know what you're talking about, I don't even know you, you're tripping" and "I don't know who the fuck you are." Sirypangno said: "You fucking said something, what the fuck did you say, don't be a pussy." Thompson responded: "Fuck you, suck my dick." K.A. testified that Sirypangno then said he would catch Thompson outside and threw a piece of wood at them.

After the exchange, K.A., Thompson, his girlfriend, and another friend remained in the backyard for between 15 and 20 minutes before leaving, to allow tempers to calm down.

Meanwhile, Phommachanh, J.R. and D.B. decided to leave the party. As the trio started walking to the car, Giraud called out Phommachanh's name and asked him to return. Phommachanh and D.B. walked back to see what Giraud wanted while J.R. continued walking to the car. Sirypangno, who appeared upset, approached Phommachanh and told him about the exchange with Thompson. According to D.B., Phommachanh told Sirypangno not to worry about it and tried to calm him down. While Sirypangno and Phommachanh were talking, J.R. drove up to the house. As Phommachanh stepped into the front passenger seat, Sirypangno handed him the gun. When J.R. asked Phommachanh about the gun, he replied that he was just holding it. Phommachanh then put the gun inside the glove compartment, and J.R. drove them away.

Within five minutes, Phommachanh received a cell phone call to come back and pick up Sirypangno. When Phommachanh and J.R. returned, Phommachanh put a bandana over his face, removed the gun from the glove compartment and stepped out of the car. Phommachanh waved the gun and shouted "who wants it"; he joined Sirypangno, Joyce and Giraud, who were lined up in front of the house waiting for Thompson to emerge from the backyard. When Thompson came out, Sirypangno approached him and said "you the fool that fucking told me to suck your dick." Sirypangno either punched or tried to punch Thompson in the face. A friend of Thompson's tackled Sirypangno, and Joyce joined the fight. K.A. tried to get Thompson to stop fighting and attempted to pull him away.

Phommachanh pointed the gun at Thompson, who put his hands up and said "no."[6] When the gun did not fire, Phommachanh cleared an unfired round from the chamber by racking back the slide of the gun. He then fired five shots, striking both Thompson and K.A. Thompson and K.A. struggled to get up and run away, but they collapsed.

Phommachanh, Sirypangno, Joyce and D.B. got into the car and J.R. drove them away. The group discovered that Joyce had been shot in the foot. Phommachanh gave the gun to Sirypangno, who told J.R. to drive to Giraud's house because they needed to hide "the strap." J.R. dropped off Phommachanh and Sirypangno at Giraud's house, where they hid the gun.[7] J.R. then drove home with Joyce and D.B. When Phommachanh returned home, he tried to clean the blood from his car. He also told J.R. and D.B. to say that he had been at home that night, if anyone asked.

Thompson bled to death. He had suffered two gunshot wounds to the left side of his body that could have been caused by the same bullet. One wound was to the left arm; the other wound was to his left flank. The bullet that entered the left flank severed the iliac artery and vein. K.A. suffered

---

[6]     K.A. testified at the trial that Phommachanh came running toward Thompson and K.A., stopped only five to seven feet from them, and began shooting. Thompson was standing between Phommachanh and K.A., but the first shot hit K.A. and she began to fall. K.A. started to run past K.A. as the second shot was fired. As the third shot was fired, both K.A. and Thompson fell. K.A. landed on top of Thompson. Both of them were face down on the ground. K.A. then jumped up and pulled Thompson up and they started running away. As they ran, K.A. heard more shots. They finally got behind a palm tree and fell into some ice plants.

[7]     The gun was later recovered during a search of Giraud's residence. Ballistic testing showed that it was the gun from which the used shell casing at the scene had been fired. DNA from Phommachanh, Sirypangno, and a third person was found on the gun.

7

gunshot wounds to her abdomen and right hip. K.A. had surgery to remove her appendix, which had burst, and half of her colon.

Detective Daniel Hatfield of the San Diego Police Department's gang unit testified that at the time of the shooting, OKB was an Asian criminal street gang with 106 documented gang members. Hatfield said OKB engaged in a pattern of criminal gang activity and the gang's primary activities were serious assaults, burglaries, automobile thefts and murders. Hatfield also testified about the workings of gangs in general, and explained that reputation and respect are of upmost importance to gangs because they enable a gang to instill fear among rival gangs and people in the community. People who live in the community often are reluctant to testify against gang members because they fear retaliation from the gang. Gang members gain respect by committing violent crimes and by backing up their fellow gang members in fights. Hatfield also testified that disrespect to a gang member is considered disrespect to the entire gang.

B. *Procedural background*

Sirypangno and Phommachanh were charged with first degree murder (Penal Code,[8] § 187, subd. (a); count 1), attempted murder (§§ 187, subd. (a), 664; count 2), and assault with a semi-automatic firearm (§ 245, subd. (b); count 3). The operative charging document also alleged that Sirypangno was a principal in the offenses, that a principal personally and intentionally discharged a firearm during the commission of the crimes charged in counts 1 and 2 (§§ 186.22, 12022.53, subd. (e)), and that both Sirypangno and his codefendant committed all of the charged crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

---

[8]     Further statutory references are to the Penal Code unless otherwise indicated.

The People prosecuted Sirypangno for the charged offenses as an aider and abettor, and the jury was instructed on both general aiding and abetting and on the natural and probable consequences doctrine of aiding and abetting liability. (*In re Sirypangno* (June 25, 2018, D073602) [nonpub. opn.].) The jury found Sirypangno guilty on all counts, and found true the enhancement allegations.

A panel of this court affirmed Sirypangno's convictions in February 2012. In 2018, this court granted Sirypangno's request for habeas relief as to his conviction for first degree murder, pursuant to the authority of *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) and *In re Martinez* (2017) 3 Cal.5th 1216. The court concluded that the trial court had erred in instructing the jury that it could find Sirypangno guilty of first degree murder on two theories, one of which was an invalid natural and probable consequences theory, and that there was a reasonable probability that the jury had relied on the invalid theory of guilt in convicting Sirypangno of first degree murder. The court remanded the matter to the superior court, ordering the superior court to modify the conviction for murder to second degree murder if the People did not elect to retry Sirypangno for first degree murder pursuant to section 1382. The People elected not to retry Sirypangno on the first degree murder charge.

In April 2019, Sirypangno petitioned the trial court for resentencing under section 1170.95. After briefing on the matter, the trial court denied Sirypangno's resentencing petition. Sirypangno has appealed from the trial court's denial of his section 1170.95 petition in related case No. D078188. Sirypangno's appellate attorney indicated that while he was working on Sirypangno's appeal in case No. D078188, he determined that the trial court had given the same "kill zone" instruction with respect to the attempted

9

murder of K.A. that was held to be improper in *Canizales, supra*, 7 Cal.5th 591, and that this was the basis for Sirypangno's current petition for habeas relief. After Sirypangno filed his petition for writ of habeas corpus, we requested that the People file an informal response. In their informal response, the People concede that Sirypangno is entitled to have his attempted murder conviction vacated based on the instructional error Sirypangno identifies.

III.

DISCUSSION

In his petition for writ of habeas corpus, Sirypangno argues that his conviction for attempted murder must be vacated because the trial court erred in instructing the jury with CALCRIM No. 600, regarding attempted murder under a kill zone theory, given the Supreme Court's clarification of the law regarding the kill zone theory as set forth in *Canizales, supra*, 7 Cal.5th 591. In an informal response, the People concede that the CALCRIM No. 600 instruction provided to the jury in Sirypangno's case did not conform to the law as set out in *Canizales*, and they further concede that the *Canizales* decision is retroactive and requires vacatur of Sirypangno's attempted murder conviction.

A. Canizales *and the kill zone theory*

In order to obtain a conviction for attempted murder, the prosecution must establish that a defendant had a specific intent to kill and took a direct but ineffectual act toward accomplishing the intended killing. (*People v. Lee* (2003) 31 Cal.4th 613, 623.) In *People v. Bland* (2002) 28 Cal.4th 313, 330 (*Bland*), the Supreme Court adopted the kill zone theory to address a situation in which a defendant intends to kill one person, as well as everyone in the intended victim's vicinity in order to ensure the intended victim's

10

death, and causes injury to someone other than the originally intended victim.  To address that situation, *Bland* "embraced the concept of a concurrent intent to kill as a permissible theory for establishing" the specific intent requirement for attempted murder.  (*Canizales, supra*, 7 Cal.5th at p. 602, italics omitted.)  Thus, under *Bland*, where the means employed by a defendant to kill a primary target creates a zone of harm around that primary target, the factfinder can reasonably infer that the defendant concurrently intended to kill everyone in that zone.  (*Bland,* at p. 330.)

A classic example of application of the theory is a situation in which a defendant places a bomb on an airplane, intending to kill one primary target by a method that is sure to kill all on board.  (*Bland, supra*, 28 Cal.4th at pp. 329–330.)  The situation at issue in *Bland* itself, however, involved a more common scenario:  the defendant shot a flurry of bullets at a fleeing car, killing the primary target and injuring passengers in the car.  (*Id.* at pp. 330–331.)  After *Bland*, a conflict arose in the appellate courts about the evidentiary basis that is required before a trial court may apply, and instruct on, the kill zone theory for establishing the intent to kill element of attempted murder; the Supreme Court granted review in *Canizales* to resolve the conflict.  (*Canizales, supra*, 7 Cal.5th at p. 602.)

*Canizales* arose out of a gang-related shooting at a neighborhood block party.  On the afternoon of the party, defendant Canizales argued with two men.  (*Canizales, supra*, 7 Cal.5th at p. 598.)  Later that day, Canizales, his codefendant, and others headed to the party.  The two men with whom Canizales had argued were at the party.  Just before the shooting, five or six men, including Canizales, lined up shoulder to shoulder facing the street where the two men were standing.  (*Id.* at pp. 599, 609.)  On seeing the primary target, Canizales's codefendant yelled out to start shooting.  (*Id.* at

11

p. 609.) The codefendant, with Canizales at his side, shot at the two men. The shooter fired five shots from a nine-millimeter gun from 100 or 160 feet away, killing a bystander but missing the two men. (*Id.* at p. 611.) One victim thought that the shooter could not control his gun, so bullets went everywhere. (*Id.* at p. 600.)

At the subsequent joint trial of Canizales and his codefendant for the murder of the bystander and the attempted murders of the two men, the jury was instructed with respect to the kill zone theory of intent. (*Canizales, supra*, 7 Cal.5th at pp. 600–601.) The prosecutor argued that the defendants could be found guilty of the attempted murders under either that theory or under the theory that the defendants had the specific intent to kill the two men. (*Id.* at p. 601.) Canizales and his codefendant were found guilty of murder and two counts of attempted murder. (*Id.* at pp. 597, 601.)

Canizales challenged the trial court's giving of the kill zone instruction. On review, the Supreme Court discussed the disagreements that the kill zone theory and its application had engendered in the appellate courts, including within the Supreme Court itself. (*Canizales, supra*, 7 Cal.5th at pp. 603–607.) In an attempt to clarify when the kill zone theory may apply, the Supreme Court set forth a two-part test for determining when an instruction on the kill zone theory is proper. "[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target, and (2) the alleged attempted

12

murder victim who was not the primary target was located within that zone of harm." (*Id.* at p. 607.) In determining whether the defendant had the intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the attack, such as the weapon used, the number of shots fired, the distance between the defendant and alleged victims, and the alleged victims' proximity to the primary target. (*Ibid.*) If this evidence shows that the defendant acted with only conscious disregard of the risk of serious injury or death for those around a primary target, rather than an intent to kill everyone in the kill zone, a kill zone instruction is improper. (*Ibid.*) Using force that merely endangers everyone in the area will not warrant the instruction. (*Id.* at p. 608.) In refining the kill zone theory, the Supreme Court set the expectation that an instruction regarding the kill zone theory will be given relatively rarely. (*Ibid.*)

Applying the refined rule regarding when a kill zone instruction is appropriate to the facts before it, the Supreme Court in *Canizales* concluded that there was insufficient evidence that the only reasonable inference that could be reached was that the defendants intended to kill everyone in the alleged kill zone. That five shots had been fired was relevant but not dispositive, and the firing of a limited number of shots at a distance of 100 to 160 feet on a wide city street did not raise a reasonable inference that the defendants intended to create a kill zone around the primary target. (*Id.* at pp. 611–612.) In addition, the circumstance that neither of the two victims of the attempted murder count were struck, combined with the other factors such as the number of shots and lack of proximity of the alleged victims to the primary target, meant that there could not be a reasonable inference that the defendants intended to create a zone of fatal harm around the primary target.

13

Because the evidence was insufficient to support the giving of a kill zone instruction, the *Canizales* court proceeded to consider whether the error in instructing on the kill zone theory required reversal. In doing so, the *Canizales* court concluded that the standard kill zone instruction was legally inadequate, and that the error in utilizing that instruction was one implicating federal constitutional principles and therefore, required application of the *Chapman* standard of prejudice review. (*Canizales, supra*, 7 Cal.5th at pp. 612–618.) Applying *Chapman*, the Supreme Court reversed the defendant's attempted murder convictions. (*Id.* at p. 618.)

Since *Canizales* was decided, the standard instruction on the kill zone theory, CALCRIM No. 600, has been revised in a manner consistent with *Canizales*. It now specifies that, "the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone [around a primary target]; and (2) [the alleged attempted-murder victim] was located within the kill zone." (CALCRIM No. 600 (2020).) The revised instruction also provides a list of circumstances that jurors should consider "[i]n determining whether the defendant intended to create a 'kill zone' and the scope of such a zone." (*Ibid.*)

B. *The law as clarified and expressed in* Canizales *applies retroactively, even to a final conviction*

As an initial matter, we note that *Canizales* did not address whether its holding should be applied retroactively to cases that are final on appeal, such as Sirypangno's. Given that the People do not address the question of retroactivity, the People appear to assume that *Canizales* applies to Sirypangno's collateral challenge and entitles him to relief.

14

The court in *In re Rayford* (2020) 50 Cal.App.5th 754, 770–778 applied the various tests relevant for determining whether a Supreme Court decision applies retroactively to cases that are final and concluded that under all of the tests, *Canizales* applies retroactively. In particular, *Rayford* concluded that under the test set forth in *Teague v. Lane* (1989) 489 U.S. 288, 302–304, the rule announced in *Canizales* is substantive and therefore applies retroactively even to final cases. The *Rayford* court explained, "Similar to *Chiu*, [*supra*, 59 Cal.4th 155,] the *Canizales* court altered the range of conduct for which a defendant may be tried and convicted of attempted premeditated murder by holding trial courts should only instruct the jury on the kill zone theory of concurrent intent where 'there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm.' [Citations.]" (*Rayford,* at p. 777.) We agree with the *Rayford* court's conclusion that *Canizales* sets out a substantive rule and applies retroactively even where a judgment is final, permitting a defendant to obtain relief through a collateral habeas corpus proceeding. (*Id.* at pp. 776–778.)

C. *At the time of the trial in this case, the evidence was sufficient to warrant the giving of a kill zone instruction, but the instruction as given was erroneous for the reasons described in* Canizales

In *Canizales*, the Supreme Court concluded that there was insufficient evidence to support the giving of any kill zone instruction. Sirypangno contends that the same is true here, and that the trial court therefore erred in giving *any* kill zone instruction. We disagree.[9]

---

9  Although we disagree with the assertion that the evidence in this case did not support any kill zone theory, as we discuss in part III.D, *post*, the court nevertheless erred by providing a legally insufficient instruction.

15

To warrant the giving of a kill zone instruction, "the record [in a particular case] would need to include (1) evidence regarding the circumstances of defendants' attack on [the primary target] that would support a reasonable inference that defendants intentionally created a zone of fatal harm around him, and (2) evidence that [the attempted murder victim] was located within that zone of fatal harm," because "[t]aken together, such evidence would permit a finding that defendants harbored the requisite intent to kill [the attempted murder victim] because [s]he was within the zone of fatal harm that defendants intended to create around [the primary target]." (*Canizales, supra*, 7 Cal.5th at p. 610.) The *Canizales* court identified the circumstances to be considered in determining whether a defendant had the intent to create a zone of fatal harm, as well as the scope of any such zone: "[T]he jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Id.* at p. 607.) The *Canizales* court explained, "Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. As the Court of Appeal recently explained in *People v. Medina* (2019) 33 Cal.App.5th 146, 156, . . . the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Canizales*, at p. 607.)

In applying these standards to the evidence before it, the *Canizales* court examined the record to determine whether "the evidence concerning the circumstances of the attack (including the type and extent of force used by [the shooter])" was "sufficient to support a reasonable inference that defendants intended to create a zone of fatal harm around a primary target." (*Canizales, supra*, 7 Cal.5th at p. 610; see *People v. Mumin* (2021) 68 Cal.App.5th 36, 47 [in deciding whether a kill zone instruction is warranted, "[t]he trial court must determine whether the evidence would support a *jury determination* that the only reasonable inference was that the defendant held the requisite intent"].)  The Supreme Court explained that "an instruction on the kill zone theory [is] warranted . . . only if there [is] substantial evidence in the record that, if believed by the jury, would support a reasonable inference that defendants intended to kill everyone within the 'kill zone.'" (*Canizales,* at pp. 609–610.)  In order "[t]o qualify [for a kill zone instruction], the record would need to include (1) evidence regarding the circumstances of defendants' attack on [the primary target] that would support a reasonable inference that defendants intentionally created a zone of fatal harm around him, and (2) evidence that [the nontarget victim] was located within that zone of fatal harm.  Taken together, such evidence would permit a finding that defendants harbored the requisite intent to kill [the nontarget victim] because he was within the zone of fatal harm that defendants intended to create around [the primary target]." (*Id.* at p. 610.)  Applying those standards to the record before it, the Supreme Court rejected the Attorney General's contention that the evidence was sufficient, concluding that "the evidence concerning the circumstances of the attack . . . was not sufficient to support *a reasonable inference* that defendants intended to create a zone of fatal harm around a primary target." (*Ibid.*, italics added.)

17

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. [Citation.] We review the trial court's decision de novo. In so doing, we must determine whether there was indeed sufficient evidence to support the giving of [the] instruction. Stated differently, we must determine whether a reasonable trier of fact could have found beyond a reasonable doubt that defendant committed [the offense based on the proffered theory]." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) "There is no instructional error when the record contains substantial evidence in support of a guilty verdict on the basis of the challenged theory." (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1290.)

In reviewing the evidence for sufficiency with respect to the giving of a kill zone instruction, we look to see whether the record includes "(1) evidence regarding the circumstances of defendants' attack on [the primary target] that would support a reasonable inference that defendants intentionally created a zone of fatal harm around him, and (2) evidence that [the attempted murder victim] was located within that zone of fatal harm." (*Canizales, supra*, 7 Cal.5th at p. 610.) In reviewing the record for this evidence, we apply familiar standards of evidentiary review. For example, "[w]e 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 550.) "In determining whether a reasonable trier of fact could have found [the defendant] guilty beyond a reasonable doubt, we presume in support of the

18

judgment ' "the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*Ibid.*)

"Appellate inquiry into the sufficiency of the evidence 'does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In other words, 'it is the jury, not the appellate court which must be convinced of the defendant's guilt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055–1056.) " ' " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' " ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 242.)

In *Canizales*, the evidence showed that the shooter fired five bullets, from around 100 feet away, on a wide city street. (*Canizales, supra*, 7 Cal.5th at p. 611.) The bullets were " 'going everywhere' " and did not hit anyone. (*Ibid.*) Although the Supreme Court was careful to indicate that a determination regarding whether substantial evidence supports instruction on the kill zone theory "does not turn on the effectiveness or ineffectiveness of the defendant's chosen method of attack," the court nevertheless found it relevant that neither of the named victims was hit by any of the shots fired, and this factor, "when viewed in conjunction with evidence regarding the limited number of shots fired, defendants' lack of proximity to [the primary target], and the openness of the area in which the attack occurred—further diminishes any inference that defendants intended to create a zone of fatal harm around [the primary target]." (*Ibid.*) The *Canizales* court therefore concluded "that the evidence concerning the circumstances of the attack

19

(including the type and extent of force used by [the shooter]) was not sufficient to support a reasonable inference that defendants intended to create a zone of fatal harm around a primary target" (*id.* at p. 610), and an instruction on the kill zone theory of liability was unwarranted (*id.* at p. 611).

Here, the circumstances of Phommachanh's attack on Thompson support a reasonable inference that Thompson was the primary target and that Phommachanh intentionally created a zone of fatal harm around Thompson. In addition, the evidence demonstrates that K.A. was located within that zone of fatal harm. First, there was evidence from which one could reasonably infer that Thompson was the defendants' primary target in the shooting.[10] For example, there was evidence that Sirypangno got into a verbal altercation with Thompson, who was the individual who had questioned Sirypangno's gang status. After Sirypangno left the party, he returned and positioned himself in a location where he could encounter Thompson when Thompson emerged from the party. Sirypangno identified Thompson to Phommachanh by approaching Thompson and saying, "[Y]ou the fool that fucking told me to suck your dick."

Second, the circumstances of the shooting also support a reasonable inference that Phommachanh intentionally created a zone of fatal harm around Thompson and that K.A. was located in that zone of fatal harm. Based on the evidence, the jury could reasonably have found that after Sirypangno yelled at Thompson and the pair began to fight, K.A. pulled Thompson away, and that is when Phommachanh came running toward Thompson and K.A.. Phommachanh stopped five to seven feet away from the

---

10 As was true in *Canizales*, no party argued that Thompson was not the defendants' primary target in the shooting. (See *Canizales, supra*, 7 Cal.5th at p. 609.)

two and began shooting. Although Thompson was standing between Phommachanh and K.A., the first shot hit K.A. and she began to fall. Thompson, apparently trying to escape, started to run past K.A. as Phommachanh shot toward the pair, who were within an arm's length of each other. When Phommachanh fired the third shot, K.A. and Thompson were both falling, with K.A. landing on top of Thompson. The pair then got up and tried to run away, and remained together, as Phommachanh fired additional shots at them. K.A. was hit by two separate bullets from Phommachanh's semi-automatic firearm. Based on this evidence, the jury could reasonably conclude that Phommachanh intended to create a zone of fatal harm within feet of Thompson, a zone within which K.A. was located, and that he had the concurrent intent to kill anyone in that zone in order to ensure that Thompson was killed.

Sirypangno argues that "the circumstances of the attack on the primary target (Thompson) were not such that the *only* reasonable inference is that Phommachanh intended to kill everyone present to ensure Thompson's death." However, under *Canizales*, this is not what our evidentiary review requires. Again, in *Canizales*, the Supreme Court stated that a kill zone instruction is proper where "there is sufficient evidence to support *a jury determination* that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm," i.e., where there is sufficient evidence to support a jury finding of intent beyond a reasonable doubt. (*Canizales, supra*, 7 Cal.5th at p. 608, first italics added.) Because it is *the jury* that must be convinced beyond a reasonable doubt, the Supreme Court's statement of the rule does not require that an *appellate court*, in reviewing the sufficiency of this evidence, determine whether the inference supporting the instruction was the

21

only reasonable inference.  Instead, as the Supreme Court explained, "an instruction on the kill zone theory would have been warranted . . . if there was substantial evidence in the record that, if believed by the jury, would support *a reasonable inference* that defendants intended to kill everyone within the 'kill zone.' " (*Id.* at pp. 609–610, italics added.)  As stated differently elsewhere in *Canizales*, " ' "evidence must appear in the record which, if believed by the jury, will support the suggested inference." ' " (*Id.* at p. 609.)

Nor does it undermine our determination with respect to the sufficiency of the evidence to give a kill zone instruction that it was Phommachanh, and not Sirypangno, who was the shooter.  Sirypangno contends that he was not the shooter but was instead, an aider and abetter, and "[u]nder principles of direct aiding and abetting, the aider and abettor must personally have the mens rea required for the charged offense."  He argues that "there was no evidence presented at trial suggesting that petitioner knew or shared any intent on Phommachanh's part to kill K.A. either directly or under a kill zone theory."  In making this argument, Sirypangno ignores the fact that he was tried as an aider and abetter not only pursuant to a direct aiding and abetting theory, but also pursuant to a natural and probable consequences theory of accomplice liability.  (See *In re Sirypangno* (June 25, 2018, D073602) [nonpub. opn.] ["At trial, the jury was instructed on general aiding and abetting theory and on the natural and probable consequences doctrine with the . . . standard jury instructions"].)  Under the natural and probable consequences doctrine, "an aider and abettor is guilty of not only the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the actual perpetrator.  The defendant's knowledge that an act which is criminal was intended, and his action taken with the intent

22

that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407–408.) "The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion.'" (*Chiu, supra*, 59 Cal.4th at p. 164.)

There is no question that at the time Sirypangno was tried, the natural and probable consequences theory of aider and abetter liability was a legally valid theory under which he could have been found criminally liable for all three of the offenses with which he was charged—i.e., murder, attempted murder, and assault with a semiautomatic firearm—even if he, himself, was not the shooter.[11] The fact that the evidence supported a finding that

_____

[11]     Since the time of Sirypangno's trial, the law concerning the natural and probable consequences theory of liability has changed with respect to the offense of murder. (See Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437).) This statutory amendment abolished the natural and probable consequences doctrine in cases of murder, and limited the application of the felony-murder doctrine. (See *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) Courts are currently divided as to whether Senate Bill 1437 affects the continued viability of the natural and probable consequences doctrine in cases of attempted murder. (Compare, e.g., *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1104, 1106, review granted Nov. 13, 2019, S258175 ["[a]s a matter of statutory interpretation, Senate Bill 1437's legislative prohibition of vicarious liability for murder does not, either expressly or impliedly, require elimination of vicarious liability for attempted murder"], *People v. Munoz* (2019) 39 Cal.App.5th 738, review granted Nov. 26, 2019, S258234 [same], *People v. Dennis* (2020) 47 Cal.App.5th 838, 844 [same]; with, e.g., *People v. Medrano* (2019) 42 Cal.App.5th 1001, 1015, review granted Mar. 11, 2020, S259948 [rejecting *Lopez* court's conclusion and instead concluding that the Legislature "must have intended for [Senate Bill 1437's] provisions to apply to all crimes requiring express malice,"

*Phommachanh* intended to create a zone of fatal harm within feet of Thompson, a zone within which K.A. was located, and that he had the concurrent intent to kill anyone in that zone in order to ensure that Thompson was killed, was sufficient to permit the court to give a kill zone theory instruction with respect to Sirypangno.

D.  *The instruction given by the court suffers from the defects identified in* Canizales; *the instructional error was prejudicial*

Although we conclude that the trial court did not err in giving an instruction on the kill zone theory, the instruction that the court gave in Sirypangno's trial suffered from the same defects those identified in the instruction in *Canizales*, as the People concede.  The jury in this case was instructed with the pre-*Canizales* version of CALCRIM No. 600, regarding the kill zone theory, as follows:

> "A person may intend to kill a specific victim or victims, and at the same time intend to kill anyone in a particular zone of harm or kill zone.

> "In order to convict the defendant of the attempted murder of [K.A.], the People must prove that the defendant not only intended to kill Tylor Thompson, but, also, either intended to kill [K.A.], or intended to kill anyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill [K.A.] or intended to kill Tylor Thompson by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [K.A.]

The People acknowledge that the Supreme Court in *Canizales* concluded that language substantively identical to this instruction was

---

including attempted murder], *People v. Larios* (2019) 42 Cal.App.5th 956, 964–968, review granted Feb. 26, 2020, S259983 [same], *People v. Sanchez* (2020) 46 Cal.App.5th 637, review granted, June 10, 2020, S261768 [same].)

24

determined to be improper because the instruction failed to adequately define the kill zone theory:

> "In relevant part, the instruction . . . explained that '[a] person may intend to kill a particular victim or victims and at the same time intend to kill everyone in a particular zone of harm or "kill zone." ' The instruction indicated that the People must prove 'that the defendant[s] not only intended to kill [the primary target] but also either intended to kill [the attempted murder victim], or intended to kill everyone within the kill zone.' Finally, the instruction directed the jury that if it had 'a reasonable doubt whether the defendant[s] intended to kill [the attempted murder victim] or intended to kill [the primary target] by killing everyone in the kill zone,' it must return verdicts of not guilty. Beyond its reference to a 'particular zone of harm,' the instruction provided no further definition of the term 'kill zone.' Nor did the instruction direct the jury to consider evidence regarding the circumstances of defendants' attack when determining whether defendants 'intended to kill [the primary target] by killing everyone in the kill zone.' " (*Canizales, supra*, 7 Cal.5th at p. 613.)

We accept the People's concession, because it is clear that the instruction given in this case is substantively the same as the instruction given in *Canizales*. We therefore next consider whether the erroneous instruction was prejudicial.

For purposes of assessing prejudice, the *Canizales* court distinguished between an instruction on an alternative theory that is "not factually supported by the evidence adduced at trial," and one that is " ' "contrary to law," or, phrased slightly differently, cases involving a " ' "*legally* inadequate theory." ' " (*Canizales, supra*, 7 Cal.5th at pp. 613–613, quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1128.) *Canizales* determined that the instruction on the kill zone theory given in that case involved both types of error; however, only an error in instructing the jury with respect to a legally

25

inadequate theory is one "of federal constitutional magnitude." (*Canizales,* at p. 615.) The *Canizales* court did not decide whether instructing of the jury on a legally inadequate theory is subject to harmless error review under *Chapman*, or whether "an even more stringent test" applies. (*Ibid.*) However, a few months after *Canizales* was decided, the Supreme Court resolved that question in *People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*), holding that "alternative-theory error is subject to the more general *Chapman*[12] harmless error test."[13] Under this test, a "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, at p. 13.)[14]

The People concede that they "cannot say the error [in this case] was harmless" under the " 'clear beyond a reasonable doubt' " *Chapman* standard of prejudice review. We agree that it cannot be determined beyond a reasonable doubt that a properly instructed jury would have found Sirypangno guilty as an aider and abetter pursuant to the natural and probable consequences doctrine under a kill zone theory. The evidence

---

12      *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

13      In contrast, the giving of an instruction that is not supported by the evidence does not require reversal unless the record affirmatively indicates that the verdict actually rests on the inadequate ground. (*Aledamat, supra*, 8 Cal.5th at p. 7.)

14      "When the theory is legally erroneous—i.e., of a kind the jury is *not* equipped to detect—a higher standard must be met for the error to be found harmless. 'These different tests reflect the view that jurors are "well equipped" to sort *factually* valid from invalid theories, but ill equipped to sort *legally* valid from invalid theories.' " (*Aledamat, supra*, 8 Cal.5th at p. 7.)

demonstrated that Sirypangno, Phommachanh, and Joyce were involved in an altercation in front of a house with Thompson, with whom Sirypangno had engaged in an angry verbal exchange earlier in the backyard of the house. K.A. and one other individual were also present during the altercation. Sirypangno tried to hit Thompson, and the two became engaged in a fist fight. As K.A. tried to pull Thompson away, Phommachanh pointed a gun at Thompson and tried to fire, but the gun jammed. After clearing the jam, Phommachanh fired five rounds, striking both Thompson, who everyone agreed was the intended victim, as well as K.A., who had no prior dispute with Sirypangno or Phommachanh or any of the others who were with them and was not confronted by Sirypangno or any others in his group. The evidence does not indicate that Phommachanh would have had any reason to target K.A., specifically, to kill. In addition, the evidence demonstrated that Sirypangno had tried to punch or otherwise hit Thompson immediately prior to when Phommachanh began shooting. In view of Sirypangno's proximity to the intended target, it is reasonably likely that the jury concluded that Phommachanh was not trying to *kill* everyone in the kill zone, but rather, was targeting only Thompson, and was merely willing to create a zone of a risk of *harm* around Thompson. Thus, the inadequate kill zone instruction may have permitted the jury to render a verdict of guilt despite the lack of a finding of an intent to *kill* everyone in the kill zone. We therefore cannot conclude that the court's giving of the legally erroneous kill zone instruction was harmless beyond a reasonable doubt, and therefore Sirypangno's conviction for K.A.'s attempted murder must be vacated.

27

IV.

DISPOSITION

Sirypangno's conviction for the attempted murder of K.A. is vacated and the matter is remanded to the superior court with directions to allow the People to elect to retry Sirypangno on the attempted murder charge. If the People do not elect to bring Sirypangno to trial within the time prescribed by law, the trial court shall enter judgment reflecting the vacatur of the attempted murder conviction and shall resentence Sirypangno accordingly.[15]

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

---

[15] In Sirypangno's direct appeal in case No. D078188, we are remanding the matter for further proceedings in the trial court in connection with Sirypangno's petition for resentencing of his murder conviction under section 1170.95. It is possible that the trial court may also have to resentence Sirypangno with respect to the murder conviction, depending on the outcome of those proceedings.